UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

JERMAL JONES,

                                    Plaintiff,

        v.

ANTHONY ANNUCCI, ACTING
COMMISSIONER OF DOCCS; CHERYL
MORRIS, DIRECTOR OF FAMILY AND
MINISTERIAL SERVICES (DOCCS);
THOMAS GRIFFIN, SUPERINTENDENT;
JAIFA COLLADO, DEPUTY
SUPERINTENDENT OF PROGRAM
SERVICES,

                                    Defendants.

No. 16-CV-3516 (KMK)

OPINION AND ORDER

---------------------------------------------------------

Appearances:

Jermal Jones
Stormville, NY
*Pro Se Plaintiff*

Colleen K. Faherty, Esq.
Kacie A. Lally, Esq.
State of New York Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Pro se Plaintiff Jermal Jones ("Plaintiff") filed the instant Complaint ("Amended

Complaint"), pursuant to 42 U.S.C. § 1983, against Acting Commissioner of the New York State

Department of Corrections and Community Supervision ("DOCCS") Anthony Annucci

("Annucci"), Director of Family and Ministerial Services Cheryl Morris ("Morris"),

Superintendent Thomas Griffin ("Griffin"), and Deputy Superintendent of Program Services

Jaifa Collado ("Collado") (collectively, "Defendants"). (Am. Compl. (Dkt. No. 23).) Plaintiff

alleges that Defendants violated his rights under the First Amendment and the Fourteenth

Amendment when they denied him the right to attend two Shia religious events and forced him

to change his religion to receive Shia-specific religious accommodations pursuant to DOCCS

policy. (*See* Am. Compl. 3–4.)[1]

Before the Court is Defendants' Motion to Dismiss the Amended Complaint pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See* Notice of Mot. To Dismiss (Dkt.

No. 29); Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") (Dkt. No. 30).)

Defendants claim that Plaintiff lacks standing to challenge DOCCS' registration policy and that

Plaintiff fails to state a claim under the First Amendment or the Equal Protection Clause. (Defs.'

Mem.) For the following reasons, Defendants' Motion is granted.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Amended Complaint, Inmate Grievance

Complaints ("Grievances") and a letter sent by Plaintiff attached as exhibits to the Amended

Complaint, (Am. Compl. Ex. A ("First Grievance"); *id.* Ex. C ("Second Grievance"); *id.* Ex. D

("Letter to Annucci")), a letter submitted in response to Defendants' request for a pre-motion

conference, (Letter from Plaintiff to Court (Mar. 23, 2017) ("Obj. Letter") (Dkt. No. 26)), and

Plaintiff's opposition to the Motion to Dismiss, (Decl. and Mem. of Law in Supp. of Pl.'s

Answer to Defs.' Mot. to Dismiss ("Pl.'s Mem.") (Dkt. No. 39)), and are taken as true for the

purpose of resolving the instant Motion. During the time of the alleged events, Plaintiff was an

---

[1] The Amended Complaint is on a standard prisoner complaint form without any
pagination. The Court will therefore refer to the ECF-generated page numbers when citing to it.

inmate confined to Green Haven Correctional Facility in Stormville, New York ("Green Haven"). (Am. Compl. 2.)

Plaintiff is a practicing Shiite Muslim. (*Id.* at 3.)[2] Since arriving at Green Haven on March 19, 2013, Plaintiff participated in every Shia Muslim religious event and attended every weekly Thursday night call-out. (*See* Letter to Annucci 1–2; Obj. Letter 1.) Plaintiff's registered religion was "Islam." (*See* Pl.'s Mem. 4; First Grievance 1 ("I'm already registered."); Letter to Annucci 1–2 (stating that since arriving at Green Haven, Plaintiff "ha[s] been registered as Shia" and asking "[h]ow could I *not* be registered and recognized as Shia" if he participated in all Shia events since arriving); *id.* at 2 (quoting Imam Wajid as stating that Plaintiff "is still listed as Islam, I've sent him a change of religion form for processing to resolve this matter."); Am. Compl. Ex. F ("Change of Religious Designation Form") ("I profess to be of the Shia faith and not of the Islam faith as previously listed.").) This is because, "[f]or centuries, it has been established that a Shiite Muslim's religion is 'Islam.'" (Am. Compl. 4; *see also* Obj. Letter 3 (alleging that Shia and Sunni are both "within the Islamic World of Orthodox Muslims"); Letter to Annucci 2 ("Shiites are Muslim and our religion *is* Islam.").)

However, on October 2, 2015, Plaintiff "was denied the right to attend the Shia observance[] of Ghadir Khum." (Am. Compl. 4; *see also* First Grievance; Letter to Annucci 1.) Similarly, between October 15 through October 24, 2015, Plaintiff was not permitted to observe the events of Muharram/Ashura, although he had previously filled out the event package. (*See* Am. Compl. 4; Second Grievance; Letter to Annucci 1; Obj. Letter 2.) "These observances are an integral part of the Shia faith." (Am. Compl. 4; *see also* Pl.'s Mem. 6 (same).) They "require

---

[2] Plaintiff uses "Shia" and "Shiite" interchangeably throughout his filings. The Court has attempted to use the same designations as Plaintiff whenever possible.

that a faithful adherent fast . . . and then break his/her fast with congregational prayer then by eating halal foods."  (Obj. Letter 2.)  Because Plaintiff was not allowed to attend these events and was "not able to buy halal foods at commissary," due to financial constraints, "he was forced to abandon performing these holy rituals" and "had to join the general populations' institutional feeding and break his fast."  (*Id.*; *see also* Pl.'s Mem. 6 ("Plaintiff was forced to either break his fast(s) and attend the general population feeding due to his lack of funds, or, continue to fast and not get fed.").)

Plaintiff was "told by the Muslim Chaplain, Imam Wajid[,] that the reason" for this denial "was because [Defendant] Collado is not allowing any inmate to participate in any Shia event unless they are registered."  (Letter to Annucci 1.)  This decision was part of a policy, enforced by DOCCS officials at Green Haven, "mandat[ing] that if a Shia Muslim inmate wanted to be recognized as such and be afforded the right to observe his faith, he would have to fill out and complete a 'Change of Religious Designation Form.'"  (Am. Compl. 4.)  The policy, requiring identification of a "particular sect," applies only to Shiite Muslims and not to inmates practicing other sects of Islam or other religions, such as Christianity, Judaism, and Rastafarianism.  (Letter to Annucci 2–3; *see also* Obj. Letter 3.)

Collado instituted this policy, which was a change from "the previous administration . . . at Green Haven," who "only required Shiite inmates to notify them in advance through the event package of how many Shiite inmates [were] participating in these events."  (Obj. Letter 3; *see also* Pl.'s Mem. 10 ("Collado was responsible for directly interfering with Plaintiff's religious rights and practices by forcing him to change his religion to a made-up religion of . . . Collado's choosing.").)  Defendant Griffin "had knowledge of . . . Collado's policy, sanctioned it, and [did] nothing to rectify the situation by stating that '[Plaintiff] is not registered as Shiite.'"  (Obj.

Letter 3; *see also* Pl.'s Mem. 9–10 (explaining Griffin's responsibility to consult with the facility chaplain under DOCCS directives).) Plaintiff was not given prior notice of this new policy "that all who were not 'registered' as Shiite would not be able to participate" in Shia religious events, and instead "was informed at the last minute of these 'changes.'" (Obj. Letter 2; *see also* Pl.'s Mem. 6 ("Plaintiff wasn't forewarned of this new policy . . . [B]ecause DOCCS officials neglected to forewarn the Plaintiff of the new policy, Plaintiff had no time to prepare and make alternate plans on how he would observe his strict religious requirements for these events." ).)

Plaintiff filed a Grievance on October 9, 2015, regarding the denial of his right to observe Ghadir Khum, requesting that he "be properly recognized as Shiite Muslim . . . . and to be afforded the right to observe all [his] Shia religious event(s), including the upcoming Ashura/Muharram." (First Grievance.) The Inmate Grievance Resolution Committee ("IGRC") timely responded, and Plaintiff appealed his Grievance to the Superintendent and the Central Office Review Committee, but did not receive a response. (Am. Compl. Ex. B; Am. Compl. 5–6.) However, Imam Wajid filled out an Investigative Report on November 2, 2015, indicating that he "sent [Plaintiff] a change of religion form for processing to resolve this matter." (Am. Compl. Ex. B; *see also* Am. Compl. 5.) Plaintiff then filed a second Grievance on October 30, 2015 regarding his inability to observe Ashura/Muharram, requesting he "not be discriminated against and denied the right to practice [his] religion." (Second Grievance.) Plaintiff also wrote a letter to Defendant Annucci, Acting DOCCS Commissioner, on November 9, 2015, informing him of his Grievances and his objections to the DOCCS policy requiring him to register as a Shiite Muslim, and asking him to "look into this matter." (Letter to Annucci.) On November 20, 2015, Plaintiff received a letter from Karen Bellamy, Director of the Inmate Grievance Program, informing him that Annucci asked her to respond to his November 9 letter and that

Plaintiff's second Grievance was consolidated with another inmate's grievance and "is currently pending an IGRC hearing." (*Id.* at 4 ("Bellamy Letter"); *see also* Obj. Letter 3).) She also explained the inmate grievance procedure. (Bellamy Letter.) Plaintiff then sent a series of letters to the Green Haven Grievance Supervisor, stating that he had received no response to the second Grievance and requesting that it be appealed through appropriate channels. (Am. Compl. Ex. E.)

On June 6, 2016, Plaintiff signed the Change of Religious Designation Form "under protest," certifying that he is "of the Shia faith and not of the Islam faith as previously listed." (Change of Religious Designation Form 1.) He also attached an "Affidavit of Truth" to the form, stating that his "religion is Islam and there is no such religion as Shia/Shiite, etc." but he is "being forced to" sign the form. (*Id.* at 2–3.) Plaintiff claims he was therefore "forced to change [his] religion to receive Shiite-specific religious accommodations." (Obj. Letter 1.) Because, "as a Muslim, Plaintiff adheres to the established belief that ALLAH specifically decided what a Muslim's religion would be called . . . it weighs heavily on Plaintiff's conscience that DOCCS officials can decide to change his already established religion to what DOCCS feels his religion should be called." (Pl.'s Mem. 7.)

Plaintiff "sustained psychological injuries that are ongoing" as a result of these events. (Am. Compl. 4.) He requests that the Court grant him "all the rights to practice [his] faith," including a series of accommodations at Green Haven, "and to be free of [DOCCS'] unlawful establishment of the Sunni faith at the expense of the Shia faith," in addition to compensatory damages and attorney's fees. (Am. Compl. 6.)

B. Procedural Background

Plaintiff filed his initial Complaint on May 11, 2016, against Annucci, Morris, Griffin, and Collado. (Compl. (Dkt. No. 2).) On July 15, 2016, the Court issued an Order of Service, directing service on the named Defendants. (Order of Service (Dkt. No. 7).) All four Defendants were served. (*See* Dkt. Nos. 8–10, 12.) After receiving an extension of time to respond to the Complaint, (Dkt. No. 14), Defendants submitted a pre-motion letter on November 18, 2016, indicating the grounds on which Defendants would move to dismiss, (Letter from Colleen K. Faherty, Esq. to Court (Nov. 18, 2016) (Dkt. No. 17)). The Court set a briefing schedule for the motion, (Dkt. No. 18), which was later extended, (Dkt. Nos. 20, 22).

However, before the Motion to Dismiss was due, Plaintiff filed an Amended Complaint on January 27, 2017. (Am. Compl. (Dkt. No. 23).) Defendants filed a new pre-motion letter again indicating the grounds on which they would move to dismiss the Amended Complaint, (Letter from Colleen K. Faherty, Esq. to Court (Feb. 14, 2017) (Dkt. No. 24)), and the Court set a new briefing schedule, (Dkt. No. 25). Plaintiff filed a letter on March 23, 2017 responding to Defendants' pre-motion letter. (Obj. Letter). After receiving an extension of time, (Dkt. No. 28), Defendants filed a Motion to Dismiss and accompanying papers on April 3, 2017, (Dkt. Nos. 29–31). After receiving an extension, (Dkt. No. 35), Plaintiff filed an opposition to the Motion to Dismiss, including exhibits, (Answer to Defs.' Motion to Dismiss (Dkt. No. 38); Pl.'s Mem). After receiving an extension, (Dkt. No. 37), Defendants filed a reply memorandum in support of the Motion to Dismiss, (Reply Mem. in Supp. of Mot. to Dismiss ("Defs.' Reply Mem.") (Dkt. No 40)). Plaintiff then filed a sur-reply. (Reply to Defs.' Reply and Mem. of Law in Supp. of Mot. to Dismiss ("Pl.'s Sur-Reply") (Dkt. No. 43).)

## II.  Discussion

### A.  Standard of Review

Defendants move to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Notice of Defs.' Mot. To Dismiss; Defs.' Mem.)  "The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are substantively identical.  In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff."  *McCray v. Lee*, No. 16-CV-1730, 2017 WL 2275024, at *2 (S.D.N.Y. May 24, 2017) (citations and internal quotation marks omitted); *see also Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003), *as amended* (Apr. 16, 2003) ("[T]he standards for dismissal under 12(b)(6) and 12(b)(1) are substantively identical.").  However, "in contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Sobel v. Prudenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014) (internal quotation marks omitted); *see also McCray*, 2017 WL 2275024, at *2 ("[O]n a Rule 12(b)(1) motion, the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)." (alterations and internal quotation marks omitted)).  This allocation of "the burden of proof" is "[t]he only substantive difference" between the standards of review under these two rules. *Fagan v. U.S. Dist. Court for S. Dist. Of N.Y.*, 644 F. Supp. 2d 441, 446–47 & n.7 (S.D.N.Y. 2009) (quoting *Lerner*, 318 F.3d at 128).

### 1.  Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint."  *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted).  "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question" (internal quotation marks omitted)).  A district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction[,] [b]ut where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration, internal quotation marks, and citation omitted); *see also Ray Legal Consulting Grp. v. Gray*, 37 F. Supp. 3d 689, 696 (S.D.N.Y. 2014) ("[W]here subject matter jurisdiction is contested a district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

### 2.  Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94

(2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted);

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). However, when the complaint is drafted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

B.  Analysis

1.  Standing

Defendants argue that Plaintiff lacks standing to challenge DOCCS' registration policy, because Plaintiff did not submit to the policy until almost eight months after he was prevented from observing the identified Shia events.  (Defs.' Mem. 3–5.)  "Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'  That case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008).  To have Article III standing to bring a claim, a plaintiff must demonstrate "(1) injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008) (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992)). These three elements constitute "the irreducible constitutional minimum of standing," and, "at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (alterations and internal quotation marks omitted).

Plaintiff alleges that DOCCS' policy of requiring him to change his religion from "Islam" to "Shia" before participating in Shia religious events is unconstitutional because it substantially burdens his religious beliefs.  However, "[a]s a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy." *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997).  "This threshold requirement for

standing may be excused only where a plaintiff makes a substantial showing that application for the benefit (or, in this case, registration) would have been futile." *Id.* Thus, Plaintiff must allege facts sufficient to show that he submitted to DOCCS' allegedly unconstitutional policy or that doing so would have been futile.

DOCCS Directive No. 4202 governs the religious programs and practices at DOCCS facilities, including the process by which prisons accommodate the religious beliefs of their inmates. (Decl. of Colleen K. Faherty in Supp. of Defs.' Mot. to Dismiss ("Faherty Decl.") (Dkt. 31) Ex. A ("DOCCS Dir. 4202") at I.)[3] "Participation by an inmate in any religious celebration, service, or study group is voluntary. Therefore, it is the responsibility of the inmate to request to participate in all religious activities of interest." (*Id.* at VI(B)(4).) "Inmates are required to provide a separate written request to participate in each religious celebration or observance that they are interested in." (*Id.* at VII(B).) The designated Chaplain for that religion or faith group then submits an "event packet" listing the participating inmates' names 45 days prior to the event. (*Id.*) "Once [an inmate] ha[s] been placed on the call-out [list], it is their responsibility to attend." (*Id.* at VI(B)(4).)

"Ordinarily[,] an inmate may attend only the religious programs of his or her designated religion as noted in facility records." (*Id.* at VI(B)(3).) An inmate may identify his religious affiliation upon initial intake at a DOCCS facility. (*See id.* (explaining at an inmate's

---

[3] The Court may consider this document when considering whether it has jurisdiction, *see Ray Legal Consulting Grp.*, 37 F. Supp. 3d at 696 (explaining that a district court may "consider evidence outside the pleadings, such as . . . exhibits" when subject matter jurisdiction is contested), as well as when it is deciding the Motion to Dismiss, *see Leonard F.*, 199 F.3d at 107 (permitting a district court to consider "matters of which judicial notice may be taken" and documents "incorporated in the complaint by reference" when deciding a motion to dismiss); *see also Morse v. Annucci*, No. 13-CV-1354, 2015 WL 5725046, at *8 (N.D.N.Y. Sept. 29, 2015) (taking judicial notice of DOCCS Directive No. 4202).

"designated religion" is "noted in facility records"); *id.* at VIII (noting that an inmate's religious affiliation is "recorded in Departmental records" "[a]fter reception/classification"); Letter to Annucci 1 (stating that since arriving at Green Haven, Plaintiff "ha[s] been registered as Shia").) *See Jackson-Bey*, 115 F.3d at 1093–94 (explaining the process of identifying a religious affiliation). However, "[a]fter reception/classification, an inmate may request an initial change of his or her religious affiliation, as recorded in Departmental records, by completing Form #4202C, 'Change of Religious Designation Form,' and presenting it to the facility Coordinating Chaplain." (DOCCS Dir. 4202 at VIII.) "It is expected that the change will be accomplished within fourteen (14) business days." (*Id.*)

Plaintiff initially registered as belonging to the religion of "Islam," and that was his registered religion at the time he was denied the right to attend the Shia observances of Ghadir Khum, on October 2, 2015, and Ashura, on October 15 through October 24, 2015. (*See* Pl.'s Mem. 4; *id.* Ex. A (noting that as of November 2, 2015, Plaintiff was "still listed as Islam"); First Grievance.) Plaintiff did not fill out Form #4202C to change his religious designation from "Islam" to "Shia" until over eight months later, on June 6, 2016, and the form was not received by Green Haven officials until June 29, 2016. (Change of Religious Designation Form.) Defendants therefore argue that Plaintiff does not have standing to challenge the DOCCS policy requiring him to change his religion to "Shia," because he did not submit to the policy *before* he was prevented from observing the identified Shia holidays. (Defs.' Mem. 3–5.)

In so arguing, Defendants rely on *Jackson-Bey*, in which the Second Circuit held that a prisoner lacked standing to bring a § 1983 suit alleging violations of the Free Exercise Clause because he did not register his religion under DOCCS Directive 4202. *See* 115 F.3d at 1092. In *Jackson-Bey*, the plaintiff requested permission in late February 1995 to wear the religious

clothing prescribed by his religion, the Moorish Science Temple ("MST"), an Islamic Sect, to his father's funeral. *Id.* at 1094. However, prison officials denied Jackson-Bey's request, because he was not registered as a member of MST in prison records. *Id.* at 1094. Instead, Jackson-Bey was "registered as a member of the Muslim religion and ha[d] refused to change his registration to [MST] (when asked directly by the facility Senior Chaplain) . . . both in 1994 and again in 1995." *Id.* at 1094–95 (citations and internal quotation marks omitted). Jackson-Bey, believing he would "betray his MST faith" if he attended the funeral without wearing such clothing, "chose not to attend the funeral" and "was thus unable to fulfill his religious obligation" at the funeral. *Id.* at 1094. He then filed a § 1983 action claiming that prison officials violated his rights under the Free Exercise Clause by denying him permission to wear MST prescribed clothing, and further asserting "that the funeral incident was part of a pattern at [the prison] of religious suppression that included denying MST members permission to worship in congregations or to have study classes." *Id.*

The Second Circuit concluded that "because any injury suffered by Jackson-Bey result[ed] from his own decision not to follow the simple procedure of registering his religion and because Jackson-Bey . . . failed to make a substantial showing that registering his religious affiliation would have been futile," he lacked standing to bring his Free Exercise claim. *Id.* at 1095. The Court first explained that the registration requirement in DOCCS Directive 4202 constitutes a "reasonable limitation[] on the accommodation of religious practices" necessary to achieve "legitimate penological objectives," including allowing prison officials to determine if and how it can implement religious accommodations. *Id.* at 1096–97. Next, the Court rejected Jackson-Bey's argument that registration would have been futile because DOCCS directives at that time "recognized only the Sunni and AMM Islamic sects," not MST. *Id.* at 1097. The Court

concluded that "it [was] not at all clear that the MST sect would not have been accommodated had Jackson-Bey registered and formally brought the subject to the attention of [the] defendants . . . at the time of his father's funeral," because there was only one registered MST member at Jackson-Bey's facility in 1994, and "all [his] requests . . . ha[d] been granted," and all registered members of the MST "were accorded permission to wear the prescribed red fez" as of June 22, 1995.  *Id.* at 1097.  Lastly, the Court rejected Jackson-Bey's argument "that because he is registered as a Muslim on facility records, he need not specify that he is a member of MST since the directives do not require a prisoner to specify his specific sect of Islam."  *Id.* at 1098.  The Court explained:

> We construe the [DOCCS] registration directive to require that an inmate register his affiliation with a specific religious sect in order to gain the benefit of being allowed to wear the accoutrements and receive other accommodations that pertain to that particular religious sect.  Jackson–Bey's proposed construction of the registration requirement would undermine many positive benefits to prison administration that registration provides.

*Id.*

At first blush, *Jackson-Bey* appears dispositive in this Action.  However, upon closer examination, and in light of the record before the Court at the Motion to Dismiss stage, the Court is unpersuaded that Plaintiff lacks standing.  The plaintiff in Jackson-Bey was informed that he must fill out Form 4202C and change his religion from Islam to MST *twice* before he was denied the ability to wear MST garb to his father's funeral, and the Second Circuit therefore found his injuries self-inflicted.  *Jackson-Bey*, 115 F.3d at 1094–95.  By contrast, Plaintiff was unaware of any DOCCS policy requiring him to change his religious designation from "Islam" to "Shia" in order to attend Shia religious services until at least October 2, 2015—the day of Ghadir Khum.  (*See* Obj. Letter 2 ("Prior to these events, Defendants did not give notice that all who were not 'registered' as Shiite would not be able to participate and Plaintiff was informed at the last minute

of these 'changes.'"); Pl.'s Mem. 6 (alleging that the "new" policy was "never posted as a memorandum, etc." to give adherents prior notice, and instead Plaintiff was informed "on the day of the event"); *id.* (alleging that Plaintiff was only told the day of Ghadir Khum, so it was too late to change his religion to attend Ghadir Khum or Ashura); Pl.'s Sur-Reply 3 ("Plaintiff was only informed that he would not be able to participate in the 2015 Shia holy events until the actual day of Ghadir Khum, and not prior to.").) Indeed, Plaintiff had attended every other Shia event from 2013 and 2014, including weekly Thursday night call-outs, despite being registered only under "Islam," (Letter to Annucci 1–2; Pl.'s Sur-Reply 2 (same)), and this new policy had "no preceden[t]" at Green Haven, where the previous administration "only required Shiite inmates to notify them in advance through the event package" which inmates were participating in Shia events, (Obj. Letter 3). Defendants do not offer anything establishing that Plaintiff did have notice of this policy so that he could submit to it. Therefore, at least as to Plaintiff's claim about being denied his right to participate in Ghadir Khum, his injuries are not self-inflicted, and therefore, he does not lack standing merely because he did not fill out Form 4202C. *Cf. Williams v. King*, 56 F. Supp. 3d 308, 326 (S.D.N.Y.) ("Because [the plaintiff] failed to register his [Shiite] sect after being informed of the policy . . . [he] lacks standing to challenge the policy."), *order clarified*, 56 F. Supp. 3d 389 (S.D.N.Y. 2014), *aff'd in part, vacated in part on other grounds*, 679 F. App'x 86 (2d Cir. 2017).

However, whether Plaintiff was informed on the day of Ghadir Khum or a few days later, Plaintiff *did* have notice of DOCCS' policy requiring him to change his religion before Ashura, which began on October 15, 2015. (*See* Pl.'s Sur-Reply 3 (alleging that Plaintiff was informed of the policy the day of Ghadir Khum, which was October 2, 2015); First Grievance (stating that Plaintiff was informed on October 8, 2015 by Imam Wajid that he "was having these problems

because [he] was not registered as Shia).)  But, construing Plaintiff's submissions liberally, *see Jackson-Bey*, 115 F.3d at 1095–96 ("Plaintiff bears the burden of alleging sufficient facts to support standing, although at this stage, we accept as true all material facts in the complaint and construe the complaint in favor of the complaining party."), Plaintiff argues that filling out the form would have been futile, because even if he completed it the day of Ghadir Khum—October 2, 2015—DOCCS Directive No. 4202 specifies that changes pursuant to Form 4202C are expected to take 14 days, meaning he would not have been registered as Shia before Ashura began on October 15.  (*See* Pl.'s Mem. 6; DOCCS Directive 4202 at VIII.)  Indeed, it appears Imam Wajid told Plaintiff on October 8, 2015 that he would already "not be allowed to observe [his] upcoming event of Ashura/Muharram" because he was not registered.  (First Grievance.)  And, Imam Wajid did not send Plaintiff Form 4202C until November 2, 2015, although Plaintiff clearly raised this issue with him after Ghadir Khum, in early October.  (*See* Pl.'s Mem. Ex. A ("Please be advised you are still listed as Islam, I'm sending you a change of religion form.  Send it back to me for processing."); First Grievance.)  Therefore, unlike the plaintiff in *Jackson-Bey*, Plaintiff here has plausibly alleged that his filling out Form 4202C would have been futile to let him attend Ashura services.  *See Jackson-Bey*, 115 F.3d at 1096 (explaining that "an unsupported claim of futility is not enough to excuse a plaintiff's failure to apply"); *cf. id.* at 1097–98 ("[W]e are unable to say that, if Jackson-Bey had followed the simple procedure of filling out the one-page form to register as an MST member at the time of his father's funeral, he would not have received the accommodation of his religious needs."); *Williams*, 56 F. Supp. 3d at 326 (finding no standing where "[the plaintiff] declined to comply with the policy . . . and there [was] no evidence in the record to suggest that compliance would have been futile").  Indeed, Defendants

advance no arguments that Plaintiff would have been able to register in time to observe Ashura under DOCCS policy.

Finally, to the extent Defendants argue that Plaintiff does not have standing to challenge DOCCS Directive No. 4202, and the concomitant requirement that he change his registered religion from "Islam" to "Shia," as an independent violation of the First Amendment, they cite no case law to support that proposition. In *Jackson-Bey*, the plaintiff did not submit to Directive No. 4202 or challenge its constitutionality; rather, he argued only that registration would have been futile, and thus did not bar standing for his free exercise claim, because the plaintiff's prison did not recognize his sect of Islam at the time. *Jackson-Bey*, 115 F.3d at 1096. By contrast, Plaintiff *did* complete Form 4202C before he sued Defendants, even if it was "under protest"—indeed, he alleges that it is the particular action of signing the form that burdened his religious beliefs. (Change of Religious Designation Form.) *See Jackson-Bey*, 115 F.3d at 1096 (explaining that "a plaintiff must submit to the challenged policy" to have standing to challenge it). Thus, the Court declines to find that Plaintiff lacks standing to bring this claim.[4]

### 2. Section 1997e(e) of the Prison Litigation Reform Act

Defendants argue that Section 1997e(e) of the Prisoner Litigation Reform Act ("PLRA") bars Plaintiff's claims because he did not suffer any physical injury. (Defs.' Mem. 14.) Section 1997e(e) states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The Second Circuit has held that "[§] 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that

---

[4] However, the Court may reconsider this issue at a later stage in the litigation if it becomes appropriate to do so. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury." *Thompson v. Carter*, 284 F.3d 411, 417 (2d Cir. 2002). However, § 1997e(e) "does not limit the availability of nominal damages for the violation of a constitutional right or of punitive damages." *Id.* at 418.

Section 1997e(e) does not bar Plaintiff's claims here, because it does not "bar an award of compensatory damages for First Amendment violations," which allege "intangible deprivations of liberty and personal rights." *Malik v. City of New York*, No. 11-CV-6062, 2012 WL 3345317, at *16 (S.D.N.Y. Aug. 15, 2012) (citing *Kerman v. City of N.Y.*, 374 F.3d 93, 125 (2d Cir. 2004)), *adopted by* 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012); *see also Russell v. Pallito*, No. 15-CV-126, 2017 WL 1093187, at *6 (D. Vt. Mar. 23, 2017) (holding that "deprivation of [the] First Amendment right [to free exercise of religion] can be a compensable injury" under § 1997e(e)); *id.* (noting that two other circuits have so held (citing *King v. Zamiara*, 788 F.3d 207, 212–15 (6th Cir. 2015) and *Aref v. Lynch*, 833 F.3d 242, 262–67 (D.C. Cir. 2016)); *Holland v. City of New York*, 197 F. Supp. 3d 529, 537 (S.D.N.Y. 2016) (holding that the plaintiff "may still recover compensatory damages for the loss of a constitutional liberty interest" under the PLRA (internal quotation marks omitted)); *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 457–58 (S.D.N.Y. 2004) (holding that "a "First Amendment deprivation presents a cognizable injury standing alone" and § 1997e(e) does not bar compensable damages for that injury).

### 3. Personal Involvement

Defendants argue that the Amended Complaint should be dismissed against them because they were not personally involved in the alleged constitutional violations. (Defs.' Mem. 10–12.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought

under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted). In other words, "because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that each of the four Defendants' actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

### a. Collado

Plaintiff has plausibly alleged Collado's personal involvement in the alleged constitutional deprivations. Construing all of Plaintiff's submissions in the light most favorable to him, he alleges that Collado instituted the policy requiring Shia inmates to change their religion from "Islam" to "Shia," which Plaintiff says violates his Free Exercise and Equal Protection rights. (*See* Letter to Annucci 1 ("I was told by the Muslim Chaplain, Imam Wajid that the reason why I was being denied was because Dept. Collado is not allowing any inmate to participate in any Shia event unless they are registered."); Obj. Letter 3 ("Collado . . . was

responsible for making her own determination to require Shiite inmates here at Green Haven to change their religion to freely practice their religious beliefs."); *id.* ("This policy instituted by Defendant Collado has no precedence here at Green Haven."); Pl.'s Mem. 10 ("Collado was responsible for directly interfering with Plaintiff's religious rights and practices by forcing him to change his religion to a made-up religion of . . . Collado's choosing.").) These allegations are sufficient to plausibly allege Collado's personal involvement. *See Grulllon*, 720 F.3d at 139 (listing direct participation and creation of a policy or custom under which unconstitutional practices occurred); *Pressley v. City of New York*, No. 11-CV-3234, 2013 WL 145747, at *10 (E.D.N.Y. Jan. 14, 2013) (concluding that the "[p]laintiff has sufficiently alleged that [the defendants] created an unconstitutional policy regarding her mail" by alleging that the defendants "collaborate on the policies for the mail room" and "have established, implemented, sanctioned, accepted or caused the deliberate practice at the City of retaining, opening and reviewing mail sent to [the] [p]laintiff and [the] [p]laintiff's business" (internal quotation marks omitted)); *Bissinger v. City of New York*, No. 06-CV-2325, 2007 WL 2826756, at *4 (S.D.N.Y. Sept. 24, 2007) (finding allegations that the defendants "created the City's policy of prohibiting protected First Amendment activity or allowed its continuance" to be "sufficient to allege individual liability"). The Court therefore denies Collado's Motion to Dismiss the Amended Complaint against him for lack of personal involvement.

### b. Griffin

Plaintiff has failed, however, to plausibly allege Griffin's personal involvement in the alleged constitutional violations. Plaintiff first alleges that Griffin "had knowledge of . . . Collado's policy, sanctioned it, and d[id] nothing to rectify the situation by stating that '[Plaintiff] is not registered as Shiite.'" (Obj. Letter 3.) It is unclear to the Court whether this

quotation is supposed to be attributed to Griffin. However, even if Griffin did state that Plaintiff was not registered as a Shiite, this statement alone does not constitute Griffin's direct involvement in the alleged constitutional violations; rather, without more factual detail, it is simply a true statement. Plaintiff does not allege, for example, that Griffin said this to Imam Wajid or another employee at Green Haven tasked with enforcing DOCCS Directive No. 4202 and the Shia registration policy. Nor does Plaintiff allege that this statement prevented him from attending the Shia events in question or to be forced to sign Form 4202C. Similarly, the conclusory statement that Griffin "had knowledge" of Collado's policy and "sanctioned it," absent more factual allegations regarding what Griffin knew or how he sanctioned the policy, does not plausibly allege Griffin's personal involvement. *See, e.g.*, *Casiano v. Cty. of Nassau*, No. 16-CV-1194, 2017 WL 4484338, at *3 (E.D.N.Y. Sept. 30, 2017) ("[C]onclusory allegations of a supervisory official's knowledge are insufficient to state a claim arising under [§] 1983.")*; Word v. Croce*, 230 F. Supp. 2d 504, 514 (S.D.N.Y. 2002) ("At most, [the] [p]laintiff makes conclusory allegations that [the] [d]efendants . . . had knowledge of the constitutional violations alleged in her complaint.").

DOCCS Directive No. 4202 provides that Griffin, as Superintendent, "in consultation with the assigned Chaplain for the affected faith group and the Director of MFVS or designee, shall resolve any conflicts pertaining to the scheduling and conduct of worship services." (DOCCS Dir. 4202 at VI(B)(5).) Therefore, Plaintiff contends, "[h]ad . . . Griffin done so, he would have known that . . . Plaintiff was already registered as 'Shiite Muslim,' and that Plaintiff was already being specifically accommodated religiously by [Green Haven] since 2013." (Pl.'s Mem. 10 (citation omitted).) However, Plaintiff does not allege that Griffin did engage in this consultation such that he was aware of "any conflicts" regarding Plaintiff's observance of Shia

holidays that he would need to "resolve." (DOCCS Dir. 4202 at VI(B)(5)).[5] *See Raymond v. City of New York*, No. 15-CV-6885, 2017 WL 892350, at *5 (S.D.N.Y. Mar. 6, 2017) ("[The] [p]laintiffs' allegations that the [i]ndividual [d]efendants knew or should have known of the customs, practices, and polices described in the [a]mended [c]omplaint . . . and condoned, ratified and/or authorized such practices and policies . . . are insufficient to allege plausibly the [i]ndividual [d]efendants' [personal involvement]." (alterations, citations, and internal quotation marks omitted)); *Marom v. City of New York*, No. 15-CV-2017, 2016 WL 916424, at *17 (S.D.N.Y. Mar. 7, 2016) (holding that allegations that the defendant had responsibility to ensure arrest teams "had definite knowledge of each arrest," and that he "knew or should have known that the NYPD's March 17, 2012 mass arrest processing plans and/or practices" would result in constitutional violations, did not plausibly allege the defendant's personal involvement (internal quotation marks omitted)), *on reconsideration in part*, 2016 WL 5900217 (S.D.N.Y. July 29, 2016). That Griffin may have acted in accordance with a DOCCS Directive is alone insufficient to establish his personal involvement in the alleged infringements of Plaintiff's Free Exercise and Equal Protection rights.

Plaintiff cites to an Exhibit showing his name on the call-out sheets for Ghadir Khum and Muharram/Ashura as evidence that Griffin should have known he was already being accommodated as a Shiite Muslim. (Pl.'s Mem. 10 (citing *id.* Ex. D).) However, these call-out sheets do not show that Griffin was aware of Plaintiff's religion or that he was not being

---

[5] The Court acknowledges that Defendants provided a version of DOCCS Directive No. 4202 dated October 19, 2015, which pre-dates at least some of the relevant events in this case. (DOCCS Dir. 4202; Am. Compl. 3 (noting that the events arose on October 2 and October 15 through 24, 2015).) However, this date only reflects when the Directive was last updated, and no Party argues that its substance materially changed on that date. Moreover, Plaintiff quotes language identical to that found in the version Defendants provided in arguing that Griffin was personally involved. (*See* Pl.'s Mem. 9–10.)

accommodated.  Rather, the sheets are all addressed to and signed by different DOCCS

employees, not Griffin, and, at least the signed sheets all pre-date the days on which Plaintiff was

denied access to the Shia events in question.  (*See* Pl.'s Mem. Ex. D.)  These call-out sheets

therefore demonstrate only that Plaintiff was initially being permitted to sign-up for Shia

religious events, not that there was a conflict in which he was no longer being accommodated

that required Griffin to become involved pursuant to DOCCS Directive No. 4202.  Or, put

differently, even assuming Griffin should have known that Plaintiff was being accommodated as

a Shiite inmate, this does not mean he also should have known that Plaintiff was no longer being

accommodated and that he condoned that change.  Therefore, absent further allegations

regarding what Griffin knew or should have known and what actions he did take or should have

taken but did not, Plaintiff's submissions fail to plausibly allege Griffin's personal involvement

in the alleged constitutional deprivations.  The Court therefore grants Griffin's Motion to

Dismiss the Complaint as to him for lack of personal involvement.

### c.  Annucci

Plaintiff also has not plausibly alleged Annucci's personal involvement in the alleged

constitutional violations.  Plaintiff alleges that he wrote a letter to Annucci informing him of

Plaintiff's Grievances on November 9, 2015, and received a response from Bellamy regarding

the grievance process on November 20, 2015.  (Am. Compl. 5–6; *see also* Letter to Annucci;

Bellamy Letter.)  Plaintiff sent his letter long after he was prevented from attending Ghadir

Khum and Ashura, (*see* Am. Compl. 4), so it is not clear how Annucci could have responded in

time to permit Plaintiff to attend those events.  Plaintiff nonetheless contends that Annucci "had

direct knowledge of Plaintiff[']s dire situation and chose not to act" after receiving his letter.

(Obj. Letter 3; *see also* Pl.'s Mem. 9 ("Annucci was put on notice by the Plaintiff . . . that his

constitutional rights were being violated . . . Annucci, knowing the serious nature of Plaintiff's concerns[,] chose not to act.").)  Instead, Plaintiff alleges, Annucci "advised Plaintiff to follow a broken grievance procedure that he knew wouldn't deal with the Plaintiff's grievances in an expedient manner."  (Pl.'s Mem. 9; *see also id.* ("As of today, [Annucci], by way of the [Central Office Review Committee], has yet to address Plaintiff's allegations, and had he done so, Plaintiff probably wouldn't have submitted to the unconstitutional policy he complained of."); Pl.'s Sur-Reply 4 ("Because . . . Annucci referred Plaintiff's concern to the grievance department, the grievance department then became the controlling factor on how [Annucci] would ultimately address Plaintiff's issues.").)

However, the allegation that Annucci did not respond to Plaintiff's letter complaining of unconstitutional conduct or his Grievances, without more, does not plausibly allege his personal involvement for § 1983 purposes.  *See Houston v. Schriro*, No. 11-CV-7374, 2014 WL 6694468, at *14 (S.D.N.Y. Nov. 26, 2014) ("[I]gnoring a prisoner's letter or complaint is insufficient to render an official personally liable."); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (holding that "[c]ourts in this circuit have said that the receipt of letters or grievances, by itself, does not amount to personal involvement" and listing cases); *Davis v. City of New York*, No. 00-CV-4309, 2000 WL 1877045, at *9 (S.D.N.Y. 2000) (finding no personal involvement where supervisory official ignored letter of protest and had no other involvement in the alleged constitutional deprivation); *Pritchett v. Artuz*, No. 99-CV-3957, 2000 WL 4157, at *6 (S.D.N.Y. 2000) (finding no personal involvement where a supervisory official ignored a prisoner's letter of complaint).  Nor is it enough that Annucci referred Plaintiff's complaint to Bellamy, who runs the grievance program.  *See Phillip v. Schriro*, No. 12-CV-8349, 2014 WL 4184816, at *5 (S.D.N.Y. Aug. 22, 2014) ("A supervisory official is not deemed to have been personally

involved solely by virtue of having received a letter or complaint from a prisoner and having referred it to the appropriate department for investigation."); *Rush v. Fischer*, 923 F. Supp. 2d 545, 552 (S.D.N.Y. 2013), *aff'd sub nom Rush v. Canfield*, 649 F. App'x 70 (2d Cir. 2016) (concluding that allegation that the defendants "received multiple letters from [the plaintiff] and referred the matter to others . . . alone is insufficient to constitute the[ir] personal involvement"); *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter."); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (concluding at the summary judgment stage that the plaintiff's letters to the DOCCS Commissioner, one of which he referred to a subordinate for decision and the other of which he responded to "by informing [the plaintiff] that [the subordinate] had rendered a decision," were insufficient to "demonstrate the requisite personal involvement" of the Commissioner); *Goris v. Breslin*, 402 F. App'x 582, 584 (2d Cir. 2010) (affirming summary judgment because the defendant's "personal involvement was limited to the receipt of two letters from [the plaintiff], which he promptly referred to other individuals for investigation and response"). This is because "DOC[C]S commissioners . . . receive large numbers of letters from inmates and they delegate subordinates to handle them. If courts found personal involvement every time a supervisor forwarded a complaint to a subordinate, the [personal involvement] requirement would lose all meaning." *Mateo*, 682 F. Supp. 2d at 430 (citations and internal quotation marks omitted).

Although Plaintiff did request in his letter that Annucci "look into this matter as to Green Haven's Policy [and] Procedure when dealing with its Shiite Muslim Population," he also noted that his grievance "has not been answered as of yet" and noted that "the issues stated therein[] I

believe need to be addressed so that my constitutional rights would not be violated in any future Islamic event(s)." (Letter to Annucci 3). Therefore, Annucci requested that Bellamy, the director of the grievance program, respond to Plaintiff's letter regarding the processing of his Grievances. (Bellamy Letter.) That Plaintiff disapproves of the grievance process or believes Bellamy's response was unsatisfactory does not plausibly allege *Annucci's* personal involvement in the alleged violation of Plaintiff's constitutional rights through the enforcement of DOCCS' Shia registration policy at Green Haven. *See Grullon*, 720 F.3d at 139 (requiring that "the defendant, after being informed of the violation through a report . . . failed to remedy the wrong" or "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring"). The Court therefore grants Annucci's Motion to Dismiss the claims against him for lack of personal involvement.

### d. Morris

Plaintiff also has failed to allege any facts regarding Morris' personal involvement in the alleged violations of his constitutional rights. Indeed, Morris' name and position as Director of Family and Ministerial Services at DOCCS appear nowhere in the Amended Complaint, other than in the caption and list of Defendants. (*See* Am. Compl. 1–2.) This is insufficient to plausibly allege personal involvement. *See Davis v. Cheverko*, No. 16-CV-4034, 2017 WL 6397749, at *4 (S.D.N.Y. Dec. 13, 2017) (dismissing complaint for lack of personal involvement because the defendant's name and position "appear[ed] nowhere in the Amended Complaint, other than in the caption" and listing cases).

Throughout all of his other submissions to the Court, Plaintiff mentions Morris only two other times. First, in his letter objecting to the Defendants' pre-motion letter, Plaintiff states: "Morris . . . had direct knowledge of Plaintiff[']s dire situation and chose not to act." (Obj.

Letter 3.)  However, this statement is purely conclusory; Plaintiff alleges no facts regarding what

Morris knew or how she should have acted, but did not.  *See Iqbal*, 556 U.S. at 681 (explaining

that "conclusory allegations" are "disentitle[d] . . . to the presumption of truth"); *Samuels v.*

*Fischer*, 168 F. Supp. 3d 625, 636 (S.D.N.Y. 2016) (rejecting as conclusory allegations that

"posit without explanation that incidents . . . were known to [the defendant]"); *Vann v. Fischer*,

No. 11-CV-1958, 2012 WL 2384428, at *6 (S.D.N.Y. June 21, 2012) (dismissing claims against

DOCCS Commissioner for lack of personal involvement where the plaintiff alleged that the

Commissioner "had knowledge of actions taken" (alteration and internal quotation marks

omitted)).  Plaintiff cites "Exhibit D in Plaintiff's Amended Complaint" as support for this

allegation, but that Exhibit is the letter Plaintiff sent to Annucci regarding his Grievances; it does

not mention Morris, and there is no indication it was sent to her, that she saw it, or that she was

aware of its contents.  (Obj. Letter 3 (citing Letter to Annucci).)  Plaintiff further asserts that

"[a]s in the case of Defendants Annucci and Morris, notice to one person generally will be

imputed to another person if an agency relationship exists between the parties," but cites no legal

authority for this proposition.  (*Id.*)  However, this proposition is contrary to the thesis of the

personal involvement requirement in § 1983 actions.  *See Iqbal*, 556 U.S. at 676 (explaining that

"because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each

Government-official defendant, through the official's own individual actions, has violated the

Constitution").[6]

 Plaintiff also argues that because Morris is responsible for ensuring that DOCCS'

_____

 [6] The Court also notes that, even if the letter were sufficient to provide notice to Annucci and even if agency theory applied here, Plaintiff alleges no facts indicating that Annucci is Morris' "agent" such that his knowledge could be imputed to Morris under an agency theory. Indeed, their titles indicate that, if anything, Annucci is Morris' principal.

religious practices comply with inmates' faiths and DOCCS' policies under DOCCS Directive No. 4202, "it would be impossible for there to be any written or unwritten policies and procedures as it pertains to the practices of the [inmates'] faiths not authorized by . . . Morris." (Pl.'s Mem. 10 (citing DOCCS Dir. 4202); *see also* Pl.'s Sur-Reply 4–5 ("Plaintiff's argument concerning Defendant[] . . . Morris is still the same as in his first Answer to Defendants' Motion to Dismiss.").)  But, the mere fact that Morris is Director of the DOCCS Division that oversees religious programs and practices at all DOCCS facilities does not alone plausibly demonstrate that Morris authored, directed, or otherwise knew of Collado's policy requiring Shia inmates to change their religion from Islam to Shia.[7]  Morris cannot be held personally liable for the alleged constitutional violations here merely "because [s]he was in a high position of authority in the prison system." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *see also Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (same).

Plaintiff has failed to plausibly allege Morris' personal involvement in the decisions to prevent Plaintiff from participating in the two identified Shia religious events or the policy requiring Plaintiff to change his religion to "Shia."  *See Grullon*, 720 F.3d at 139 (listing categories of personal involvement).  The Court therefore dismisses Plaintiff's claims against Morris.

### 4.  Free Exercise Claim

Collado argues that the Amended Complaint fails to state a Free Exercise claim under the First Amendment.  (Defs.' Mem. 5–7).  "Prisoners have long been understood to retain some

---

[7] Indeed, the Court notes that Collado and Morris are alleged to work in different DOCCS departments—Program Services and Family and Ministerial Services, respectively—so it is not plausible to draw the inference that Morris knew of or worked on Collado's policy merely because they both worked on religious programming at DOCCS facilities.

measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003), which includes the "constitutional right to participate in . . . religious services," *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993).  A prisoner's First Amendment rights, however, are "[b]alanced against . . . the interests of prison officials charged with complex duties arising from the administration of the penal system." *Ford*, 352 F.3d at 588 (internal quotation marks omitted).  Accordingly, a prisoner's free exercise claims are "judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford*, 352 F.3d at 588 (internal quotation marks omitted).

"To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs." *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (alteration and internal quotation marks omitted); *see also Salahuddin v. Goord*, 467 F.3d 263, 274–45 (2d Cir. 2006) ("The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.").[8] "[A] substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (alterations and internal quotation marks omitted); *see also Gilliam*, 2017 WL 476733, at *5

---

[8] The Second Circuit has acknowledged that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014).  The Second Circuit chose not to confront this question—or rather, not to alter the previous assumption that the substantial burden test is a threshold question. *Id.*  This Court has already chosen to follow the analysis in *Holland* and thus will proceed under the assumption that the substantial burden test is still valid. *See Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at *4 n.5 (S.D.N.Y. Feb. 2, 2017).

(same). The Second Circuit has further specified that "[t]he relevant question in determining whether [the plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the plaintiff's religious] practice." *Ford*, 352 F.3d at 593-94. Once the plaintiff satisfies this burden, the defendants then "bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," although "the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (alterations and internal quotation marks omitted). To determine whether conduct is justified by a legitimate penological interest, a court must consider:

> whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Holland*, 758 F.3d at 222–23 (quoting *Salahuddin*, 467 F.3d at 274).

Construing his submissions liberally, Plaintiff alleges two ways Collado's policy substantially burdened the free exercise of his Shia religion: (1) he was prevented from observing Ghadir Khum and Muharram/Ashura; and (2) he was forced to change his religion in order to observe future Shia holidays. (*See* Am. Compl. 4.)[9] As alleged, neither event violated the Free Exercise clause.[10]

---

[9] The Court notes, however, that Plaintiff only appears to press the second claim— regarding signing Form 4202C to "change" his religion—as a substantial burden on the exercise of his religion. (*See* Pl.'s Mem. 5–8.)

[10] Because Defendants do not contest the sincerity of Plaintiff's religious beliefs, the Court will assume for the purpose of resolving the instant Motion that Plaintiff's religious beliefs were sincerely held.

<u>a.  Missed Shia Religious Events</u>

"In the Second Circuit, courts have held that preclusion from attending two religious services is not, without more, a 'substantial burden' on a plaintiff's free exercise of religion." *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 588 (S.D.N.Y. 2015); *see also Jean–Laurent v. Los*, No. 12-CV-132, 2015 WL 1015383, at *6 (W.D.N.Y. Mar. 9, 2015) (noting "[c]ourts within the Second Circuit have consistently held that missing two religious services does not pose a substantial burden on an inmate's religion" and collecting cases); *Blalock v. Jacobsen*, No. 13-CV-8332, 2014 WL 5324326, at *7 (S.D.N.Y. Oct. 20, 2014) ("Courts in [the Second] Circuit, however, have held that the conduct [the plaintiff] challenges—the denial of two religious services—does not substantially burden an inmate's right to religious observation.").  However, Plaintiff has alleged that both Ghadir Khum and Muharram/Ashura "are an integral part of the Shia faith."  (Am. Compl. 4; *see also* Pl.'s Mem. 6 ("[T]he strict observance of [Ghadir Khum and Ashura] are an integral part of the Shia faith.").)  He also alleges that these "religious holy events . . . require that a faithful adherent fast (as the same as Ramadhan [sic]) and then break his/her fast with congregational prayer then by eating halal foods."  (Obj. Letter 2.)  As a result of being unable to attend these events, Plaintiff alleges that he "was burdened by performing these Islamic rituals on his own," without access to halal foods, and thus "was forced to abandon performing [them]" and to "break his fast" by eating with the general population.  (*Id.*; *see also* Pl.'s Mem. 6 ("Plaintiff was forced to either break his fast(s) and attend the general population feeding due to his lack of funds, or continue to fast and not get fed.").)

Construing Plaintiff's submissions liberally and drawing all reasonable inferences from the factual allegations in Plaintiff's favor, the Court finds that Plaintiff has plausibly alleged that Ghadir Khum and Muharram/Ashura were "central or important to" his faith.  *Ford*, 352 F.3d at

593-94; *see also Williams v. Does*, 639 F. App'x 55, 57 (2d Cir. 2016) (concluding that the plaintiff "alleged a plausible free exercise claim" because the "complaint alleged that the premature sunset meals forced him to either forgo his meal or break his fast; he characterized fasting for Ramadan as important to his practice of Islam and stated that eating before sunset was a 'grave spiritual sin' that canceled the 'validity' of fasting"); *Allah v. Annucci*, No. 16-CV-1841, 2017 WL 3972517, at *9 (S.D.N.Y. Sept. 7, 2017) (finding that the plaintiff "adequately pleaded that the religious events were central or important to his faith" when the plaintiff "repeatedly refer[red]" to [the events] as 'Holy Days,' . . . specifically allege[d] that the events are 'unique to Shi'ism,' . . . [and] [t]hese allegations [were] made in conjunction with claims that [the] [p]laintiff suffered from additional deprivations" (alterations and citations omitted)); *Torres v. Aramark Food*, No. 14-CV-7498, 2015 WL 9077472, at *9 (S.D.N.Y. Dec. 16, 2015) (finding religious beliefs substantially burdened when the plaintiff was "forced to choose between eating nutritionally adequate meals and complying with his religious fasting requirements").

However, Plaintiff alleges that he was forced to miss these religious events because of Collado's Shia-registration policy. (Obj. Letter 2 ("[A]ll who were not 'registered' as Shiite would not be able to participate."); Pl.'s Mem. 6 (alleging that Plaintiff was informed of the "new" policy on the day of Ghadir Khum); First Grievance (stating that Plaintiff was informed on October 8, 2015 that the registration policy would prevent him from attending Ashura).) The Second Circuit has held that requiring an inmate to register his religious affiliation "entails only a modest act of commitment," and serves legitimate penological interests:

> Registration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times. Registration also allows prison officials to gauge the interest in any particular religion on the part of the inmate population and thus decide whether a "congregation" should be allowed. Registration puts the institution on notice that certain religious accommodations will likely be sought

and thereby provides the institution with time to consider if and how to implement them. This, in turn, makes such accommodations more likely and thereby reduces the circumstances in which judicial intervention will be needed. In short, registration places, at most, a slight burden on an inmate's right to religious freedom while serving as an important and beneficial "bright line" that enables prison officials to ascertain the seriousness of the inmate's religious commitment and respond accordingly.

*Jackson-Bey*, 115 F.3d at 1097. These interests extend to DOCCS Directives requiring "that an inmate register his affiliation with a specific religious sect in order to . . . receive other accommodations that pertain to that particular religious sect." *Id.* at 1098.

Plaintiff alleges that he did not have notice of the Shia registration policy before Ghadir Khum and that it unfairly singles out Shiite Muslim inmates. (*See* Obj. Letter 2–3.) However, these facts, even if true, do not plausibly allege that Collado's proffered justification—to allow prison officials to decide when and how to provide accommodations to Shia inmates based on how many Shia inmates exist in the prison—is "irrational." *Salahuddin*, 467 F.3d at 275 (internal quotation marks omitted). Rather, a policy existed requiring an inmate to register as Shia Muslim before participating in Shia Muslim services, Plaintiff was not registered under this policy, and consequently, Plaintiff was not permitted to attend Ghadir Khum or Ashura services. Indeed, in light of Plainitff's allegations that Shia Muslims celebrate some holidays different from Sunni Muslims and his submission of a DOCCS report showing that, as of September 2016, there are only 16 inmates at Green Haven registered as Shia Muslims, it is not plausible, absent more factual allegations, that Collado's proffered justification is irrational. (*See* Change of Religious Designation Form (affidavit alleging that Shia Muslims practice a specific type of Islam); Obj. Letter Ex. A ("DOCCS Religious Affiliation Report").[11] *See, e.g., Rush v. Malin*,

_____

[11] The Court may consider this DOCCS report, which is both a government record and was submitted by Plaintiff. *See Agu*, 2010 WL 5186839, at *4 n.6 (noting that a court may consider "documents that a pro se litigant attaches to his opposition papers"); *see also Paskar v.*

No. 15-CV-3103, 2016 WL 5793752, at *5 (S.D.N.Y. 2016) (explaining that Shia and Sunni Muslims celebrate different days of Ashura).

Therefore, Plaintiff has failed to state a Free Exercise claim for being prevented from observing Ghadir Khum or Ashura. *See Nimmons v. Fischer*, No. 11-CV-817, 2013 WL 4495006, at *10–11 (W.D.N.Y. Aug. 20, 2013) (noting the purposes served by the registration policy and concluding that because the plaintiff "failed to register his religion" after DOCCS policy changed, his free exercise claim failed). This conclusion is reinforced by Plaintiff's allegations that he could have observed Ghadir Khum and Ashura on his own by purchasing halal foods from the commissary, but he lacked the funds to do so. (Obj. Letter 2; Pl.'s Mem. 6.) *See Salahuddin*, 467 F.3d at 274 (asking "whether prisoners have alternative means of exercising the burdened right"). Therefore, because Collado has "proffer[ed] an explanation as to why [Plaintiff] was denied access to religious services," the Court grants the Motion to Dismiss this Free Exercise claim. *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989) (explaining a defendant's obligation at the motion to dismiss stage).

### b. Signing Form 4202C

Plaintiff does not plausibly allege that being forced to sign Form 4202C to change his religious designation from "Islam" to "Shia" imposed a substantial burden on the exercise of his religion. Plaintiff contends that filing out the form required him to actually *change* his religion. (*See* Pl.'s Mem. 7 ("[I]t weighs heavily on Plaintiff's conscience that DOCCS officials can decide to change his already established religion to what DOCCS feels his religion should be called."); *id.* (alleging that Defendants "forced Plaintiff to change his religion of Islam to one

_____

*City of New York*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014) ("Official government reports and other types of government records are appropriate for judicial notice.").

that doesn't exist").) However, filling out and signing a form to register under a religious affiliation to receive accommodations is an inconvenience, not a substantial burden. *See Jackson-Bey*, 115 F.3d at 1096 ("Registration of religious affiliation . . . entails only a modest act of commitment by the inmate while serving several legitimate penological interests."); *Spavone v. City of New York*, 420 F. Supp. 2d 236, 240 (S.D.N.Y. 2005) ("Plaintiff was not substantially burdened by the DOC[CS] policy of only permitting inmates to participate in one religion . . . . This is, at best, an inconvenience, but does not rise to the level of a burden on Plaintiff.") And, although Plaintiff alleges that he "adheres to the established belief that ALLAH specifically decided what a Muslim's religion would be called," he does not allege any facts plausibly suggesting that Collado's policy required him to abandon this belief or to adopt a new religion. (*See* Pl.'s Mem. 7.) Indeed, Plaintiff signed Form 4202C "under protest." (Change of Religious Designation Form.) He also could have written "Shia *Islam*" instead of just "Shia," crossed out "change" at the top of the form, or crossed out "not of the Islam faith." (*Id.*) Plaintiff alleges no facts suggesting that DOCCS' policy required him to specifically state that he was *not* a Muslim; rather, he alleges that they wanted him to specify he was a practicing Shiite Muslim so that he could receive accommodations pertaining to that sect, and only that sect, of Islam. (*See* Letter to Annucci 1–2 ("Collado is not allowing any inmate to participate in any Shia event unless they are registered. . . . Why are Shiites singled out and forced to register and identify their particular sect . . .?"); Pl.'s Mem. 5 (alleging that he had to register as Shia so that his "prior accommodations [would] continue"); *see also* Faherty Decl. Ex. B ("DOCCS Custody Report") 10 (showing inmate religious affiliation categories as including only "Islam," which presumably includes inmates registered under any sects of Islam for accommodation purposes under DOCCS

Directive No. 4202).)[12]  Plaintiff also does not identify any other religious rights or rituals he was forced to abandon as a result of signing the form.  Therefore, Plaintiff does not plausibly allege that signing Form 4202C "put[] substantial pressure on [him] to modify his behavior and to violate his beliefs."  *Jolly*, 76 F.3d at 477 (internal quotation marks omitted)s.  The Court thus grants Collado's Motion to Dismiss this Free Exercise claim.

## 5.  Equal Protection Claim

Collado argues that Plaintiff fails to state a claim under the Equal Protection Clause. (Defs.' Mem. 7–10.)  To plead a plausible equal protection claim, a plaintiff must allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination."  *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005); *see also Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008) ("In order to plead a facially valid equal protection claim . . . [a] plaintiff must allege: (1) that he has been treated differently from similarly-situated inmates, and (2) that the discrimination is based upon a constitutionally impermissible basis, such as race, religion, national origin, or some other protected right.").  "Individuals are 'similarly situated' when their circumstances are alike in all material respects."  *Walker v. City of New York*, No. 05-CV-1283, 2010 WL 5186779, at *7 (E.D.N.Y. Dec. 15, 2010) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).  "Similarly situated does not mean identical, but rather 'a reasonably close resemblance of the facts and

---

[12] The Court may consider the statistics in this DOCCS Report when deciding the instant Motion to Dismiss.  *See United States v. Gonzalez*, 442 F.2d 698, 709 (2d Cir. 1970) (taking judicial notice of drug crime statistics from a Department of Narcotics and Dangerous Drugs report); *Paskar*, 3 F. Supp. 3d at 134 ("Official government reports and other types of government records are appropriate for judicial notice."); *Williams v. Swack*, No. 12-CV-1552, 2013 WL 5423791, at *6 (E.D.N.Y. Sept. 26, 2013) (taking judicial notice of "DOCCS Inmate Population Information"); *Placide-Eugene v. Visiting Nurse Serv. of New York*, No. 12-CV-2785, 2013 WL 2383310, at *12 (E.D.N.Y. May 30, 2013) (noting that "the [c]ourt can take judicial notice of government statistics" (alteration and internal quotation marks omitted)).

circumstances of plaintiff's and comparator's cases.'" *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)); *see also T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 463 (E.D.N.Y. 2002) ("The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." (internal quotation marks omitted)).

Plaintiff alleges that the policy requiring Shiite inmates to register their specific religious sect to receive sect-specific accommodations does not apply to inmates belonging to other sects of Islam, including Sunni Muslims, or Christian, Jewish, and Rastafarian inmates. (*See* Letter to Annucci 2–3.) However, even assuming that inmates of these other religious affiliations are not required to register with their specific religious sect, Plaintiff does not allege that they are similarly situated to him and other Shiite inmates. As previously explained, the registration requirement is used to help prison officials determine the level of interest in a particular religion in the inmate population in order to determine whether and how to implement certain accommodations. *Jackson-Bey*, 115 F.3d at 1097. DOCCS Directive No. 4202 explicitly states that:

> It should be clearly understood that DOCCS takes no position "acknowledging" any particular religion within its inmate population. DOCCS merely attempts to identify particular faiths within the population in an effort to accommodate the legitimate spiritual needs of its inmates as reasonably as possible in a manner which is commensurate with its legitimate correctional interests and the safety and security of its respective facilities.

(DOCCS Dir. 4202 at III.) Therefore, the number of inmates adhering to a particular religious group and whether that group requires distinct accommodations are material traits in assessing whether inmates are similarly situated under DOCSS' registration policy. *See, e.g.*, *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (noting the importance of "size" of a religious sect and the "demand" for certain accommodations are important considerations in determining whether a

prison is providing inmates reasonable opportunities for the exercise of religion); *Graham v. Mahmood*, No. 05-CV-10071, 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22, 2008) (explaining that groups of 39 Nation of Islam adherents and 119 Sunni Muslim inmates were "not similarly situated" because "the two groups have different needs for access to meeting spaces and time slots"); *id.* at 15 ("At most, plaintiff speculated that the Sunni Muslims receive better treatment because they were a more established group at [the prison]. This does not support an equal protection claim." (citation omitted)).

Although Plaintiff alleges that there are many other sects of Islam, and indeed many sects of Sunni Islam, and that none of those sects is required to register its sect, (Letter to Annucci 2–3), he does not allege how many Sunni Muslim inmates there were at Green Haven and whether they celebrate distinct holidays or engage in distinct religious practices unique to Sunni Islam. Indeed, Plaintiff alleges that Shia Islam is distinct from Sunni Islam and does not necessarily require the same accommodations, a proposition that has been frequently litigated in the Second Circuit. (Obj. Letter 3.) *See, e.g.*, *Rush*, 2016 WL 5793752, at *5 (noting that Shia Muslims celebrate the first 9 days of Ashura and "all Islamic adherents" celebrate the last two days). Moreover, as previously stated, Muslim inmates represent 11.3% of DOCCS' total inmate population, (DOCCS Custody Report 10), whereas only 16 inmates are registered as Shiite Muslim at Green Haven, (DOCCS Religious Affiliation Report). Therefore, absent further factual allegations regarding what Sunni-specific accommodations Sunni inmates may require, how many Sunni inmates there are at Green Haven or in DOCCS generally, or any instance of a Sunni inmate receiving a Sunni-specific religious accommodation while still being registered only under "Islam," Plaintiff has failed to plausibly allege that Sunni inmates are similarly situated to Shia inmates for purposes of the sect-registration policy. Similarly, although Plaintiff

notes the existence of other sects of Islam, he does not allege that any inmates belong to these sects and that they have received sect-specific accommodations without registration.

Plaintiff also alleges that "other Christian, Jewish, or Rastafarian religious groups and their respected 'sects'" are not "required to change their religions in order to freely practice their faiths." (Obj. Letter 3.) However, again, he does not allege whether and how many inmates belong to sects of these religions and whether those sects observe different holidays or otherwise require different accommodations like Shiite Muslims do.[13] And, although Plaintiff asserts that the registration policy is generally "discriminatory in nature," (Obj. Letter 2), such conclusory allegations are insufficient to meet the plausibility pleading standard. *See Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 470 (2d Cir. 2006) ("[The plaintiff's] complaint proffers only a conclusory allegation of discrimination, which, without evidentiary support or allegations of particularized incidents, does not state a valid claim and so cannot withstand a motion to dismiss." (internal quotation marks omitted)).

Therefore, the Court grants Collado's Motion to Dismiss the Equal Protection claim.[14]

---

[13] As support for his claim, Plaintiff attaches two purported declarations from inmates at Green Haven attesting that they do not have to register with their sects—of Rastafarianism and Islam, respectively—in order to receive religious accommodations. (*See* Pl.'s Mem. Ex. C.) However, as Defendants note, (Defs.' Reply Mem. 6 & n.4), these declarations are unauthenticated and are from non-parties to this Action. Therefore, the Court will not consider them at the motion to dismiss stage. *See U2 Home Entm't, Inc. v. Kylin TV, Inc.*, No. 06-CV-2770, 2007 WL 2028108, at *4 (E.D.N.Y. July 11, 2007) ("Case law suggests that where a plaintiff relies on documents of disputed authenticity . . . the court may not consider them on a motion to dismiss."); *Philadelphia Parking Auth. vs. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 284–85 (S.D.N.Y. 2005) (explaining that a court may consider external documents only when they are "of undisputed authenticity" and attached to the complaint, incorporated by reference, relied upon by the plaintiff in suing, or matters of which judicial notice may be taken).

[14] Because the Court grants the Motion to Dismiss on the merits, it need not reach Collado's alternate argument that he is entitled to qualified immunity. (*See* Defs.' Mem. 12–13.)

## III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted. However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. *See Terry v. Inc. Vill. Of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").

Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The new amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations raised in supplemental declarations, affidavits, or letters. If Plaintiff fails to abide by the 30-day deadline, this Action could be dismissed with prejudice.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 29), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: February $l$ 3 , 2018
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE